**STATE DEPARTMENT OF HIGHWAYS AND PUBLIC TRANSPORTATION,**
**Appellant,**

v.

**Edna KING, et al., Appellees.**

**No. 09–89–111 CV.**

Court of Appeals of Texas,
Beaumont.

Aug. 30, 1990.

Rehearing Denied Oct. 4, 1990.

Cynthia Hooper, Asst. Atty. Gen., Austin, for appellant.

John W. Newton, III, Gilbert I. Low, Orgain, Bell & Tucker, Beaumont, for appellees.

## OPINION

WALKER, Chief Justice.

This appeal arises from a suit brought under the Texas Tort Claims Act, TEX. CIV.PRACT. & REM.CODE ch. 101, wherein Edna King, individually and on behalf of Cecil King, deceased, Rhonda King and Lisa King sought damages from the State Department of Highways and Public Transportation for injuries and damages occurring in a March 13, 1985 automobile accident. In this case, Cecil King received fatal injuries. Edna King, Rhonda King and Lisa King received severe personal injuries.

A jury trial was held in the 172nd Judicial District Court of Jefferson County, Texas before the Honorable Thomas A. Thomas. The court submitted the case against the State Department of Highways and Public Transportation under four separate and independent theories of recovery and the jury found in favor of the appellees under all theories submitted. The jury found: (1) The State was negligent in failing to place mandatory (nondiscretionary) traffic or road signs, signals or warning devices on the roadway, and this negligence proximately caused the damages complained of (TEX.CIV.PRAC. & REM. CODE sec. 101.060(a)(1)); (2) the State was negligent in failing to correct, within a reasonable time after notice, the absence, condition or malfunction of traffic or road signs, signals or warning devices, and this negligence was a proximate cause of the damages complained of (sec. 101.060(a)(2)); (3) the State was negligent in failing to warn of hazards not normally connected with the use of the roadway, and this negligence was a proximate cause of the damages complained of under sec. 101.022(b) and sec. 101.060(b); and (4) the State was negligent in failing to warn or make safe a dangerous condition and this negligence proximately caused the damages complained of under sec. 101.022(a).

As between Ronald Lee Wright, a third party defendant, and the State Department of Highways and Public Transportation, the jury assessed the negligence proximately causing the collision as follows: Wright, 15%; State Department of Highways and Public Transportation, 85%.

On January 17, 1989 the court signed the judgment reflecting the verdict of the jury. The State, thereafter pursued this appeal.

In order to promote clarity, appellant, State Department of Highways and Public Transportation, will be referred to as either "the State" or "the Highway Department" or "appellant". The appellees will be referred to either by their individual name or collectively as "the Kings" or "appellees".

It is important that we cover in some detail the events surrounding the automobile collision and the evidence presented to

the jury. The accident occurred in the 3400 block of the north frontage road to Highway 73 in Port Arthur, Jefferson County, Texas. Mr. King, his wife and two daughters were struck head-on by a car driven by Ronald Lee Wright just as the Kings were preparing to enter the entrance ramp for the west bound traffic of Highway 73. The Kings were on their way to church when this tragedy occurred.

The roadway in issue is the north frontage road to Highway 73 between 9th Avenue and the Texaco freshwater canal. This particular stretch of roadway is unusual. One-way traffic only is permitted westbound from 9th Avenue to a small C-shaped roadway just past the westbound entrance ramp to Highway 73. However, two-way traffic is permitted eastbound from the cul-de-sac at the end of the road back to the C-shaped roadway. In other words, one-half of this frontage road is one-way and the other half is two-way. As a result, a point of conflict exists between the one-way and two-way traffic which one State engineer described as "not a good situation" and another witness testified that the situation was a "less than desirable situation". Franklin Young, the District Engineer, admitted it created a potential for accidents.

The eastbound frontage road traffic, that is, the traffic from the cul-de-sac toward 9th Avenue, must take the C-shaped roadway and enter the westbound lanes of Highway 73. The eastbound traffic is required to take this C-shaped roadway and is not permitted to drive past it. If the eastbound traffic does not see the C-shaped roadway, it will drive straight into the traffic lawfully travelling on the one-way portion of the frontage road. This is precisely what occurred when Ronald Lee Wright missed the roadway and struck the Kings as they were preparing to enter Highway 73.

According to the record before us, on March 13, 1985, this C-shaped roadway was not paved. It had grass growing in, on and through it. It was sunken between a grassy median on one side and a raised traffic island on the other. Also, according to the record, it was not marked. The record further reflects that no lane-use control signs, which were mandatory at that location according to the *Texas Manual on Uniform Traffic Control Devices*, were in place. There were no signs directing the eastbound traffic, such as Ronald Lee Wright, to the C-shaped turnaround or advising that turning movements were required. The only signs posted at the C-shaped roadway facing the eastbound traffic were two "Do Not Enter" signs. Both of these "Do Not Enter" signs were placed farther from the roadway than specified by the State's *Manual on Uniform Traffic Control Devices*. According to the record, this did not meet the manual specification. This reduced the chances of seeing the signs and had a tendency to confuse drivers. All this, according to Dr. Olan K. Dart an experienced traffic engineer, constituted a dangerous condition. This dangerous condition, in Dr. Dart's opinion, was a cause of the accident.

Dr. Dart testified at length as to what could have been done to make the dangerous condition safe or warn of its dangers. Virtually everything Dr. Dart suggested was provided for in the State's own manual and did not involve changing or altering the basic design of the roadway. The condition could be made safe with only paint and signs. According to the defendant's expert, each sign would cost approximately "$50.00" and the paint approximately "$20.00, $25.00".

The frontage road where the accident took place was within the jurisdiction of the State Department of Highways and Public Transportation. The Highway Department had the responsibility by law to maintain this stretch of roadway in a manner to insure the safety of the travelling public. This obligation included mowing the grass on the grassy median and keeping the C-shaped turnaround visible so the traffic can see it. The State was aware that grass would grow on the turnaround and the State would rely on either traffic to wear the grass off or a chemical vegetation program to take it off. One reason the State tries to keep the grass off the roadway is so it will not block the view of the roadway.

As Cecil King and his family were approaching the point where this accident occurred, another vehicle, driven by Ronald Lee Wright, was proceeding in an easterly direction in the right lane of the two-way section of the frontage road (west of the point of conflict). Thus, just prior to the collision, both Mr. King and Ronald Lee Wright were travelling in their proper lanes of travel. Mr. King intended to take the entrance ramp and Mr. Wright who was unfamiliar with the area, did not take the C-shaped roadway to Highway 73 and instead he continued straight resulting in a violent head-on collision between the King and Wright vehicles. Mr. King was killed. His wife and two daughters suffered disabling personal injuries. During the collision, Edna King was thrown forward with such force that her head shattered the windshield. Rhonda King was rendered unconscious and subsequently woke up blind in a hospital in Galveston, Texas. Her sight did not return for several days. Lisa King suffered a broken leg and was forced to undergo two surgeries. Lisa was confined to a wheelchair for four to five months as a result of the accident and still has a permanent limp.

The record reveals that the only sign posted by the State facing Cecil King or other drivers headed in a westerly direction on this service road was a "Dead End" sign posted several feet past the beginning of the entrance ramp into the highway. The State's *Manual on Uniform Traffic Control Devices* was admitted into evidence and reveals that "two-way traffic ahead" warning signs are intended to give warning of a transition from a separate one-way roadway to a two-way roadway and in this case no signs were posted informing the drivers headed in a westerly direction, such as Cecil King, that the one-way service road suddenly became a two-way road. Appellees contend and the evidence reveals that the Kings were not warned by the State of the presence of two-way traffic ahead and of the associated potential of meeting oncoming traffic head on. In response to a question inquiring whether the Highway Department adequately warned westbound travellers such as Mr. King of

the potential hazard of two-way traffic meeting one-way traffic, Joseph Blaschke, the State's expert, responded, "There was no sign as such in that direction."

Evidence at the time of trial revealed that the Highway Department was aware of the dangers of two-way traffic meeting one-way traffic. The State admitted the potential for one-way traffic meeting two-way traffic was an unusual hazard and one not normally connected with the use of the roadway. One State engineer, Cecil Norris, testified by deposition that there had "been a concerted effort on our part to make frontage roads one-way, a one-way operation, where you have two-way operations coming into a single operation. It's not a desirable situation, less than desirable."

The 1980 version of the *Texas Manual on Uniform Traffic Control Devices* controlled the signing on the roadway. This manual was adopted by the State per legislative mandate. The manual provides that where turning movements are required or where unconventional turning movements are permitted at specific lanes from an intersection, lane-use control signs shall be used. The manual defines "shall" as a mandatory condition.

All of the evidence agreed that Ronald Lee Wright was required to turn onto the C-shaped roadway and was not permitted to pass it and drive forward. Even though turning movements were required from Wright's lane of traffic and the *Texas Manual on Uniform Traffic Control Devices* makes mandatory a lane-use control sign in that precise situation, the State failed to post a lane-use control sign to indicate that Wright's lane of travel was required to take the C-shaped roadway and enter Highway 73 and additionally, there were no markings on the roadway itself indicating the required turning movement or the presence of the C-shaped roadway.

In addition to specifying what signs are to be in place at a particular location, the manual also specifies where the signs are to be placed on the roadway. The two "Do Not Enter" signs which were the only signs facing Wright just prior to the fatal

collision, according to the evidence, were not placed within the specifications set by the manual. Evidence reveals that they were placed farther from the roadway than specified in the manual.

The State did not contend that Cecil King or his family were, in any way, negligent.

Appellant brings to the court 14 points of error, most of which appellees contend should be overruled without reaching the merits raised by those points. Appellant, no where in their brief nor in their first amended brief, address appellees' contentions in this regard.

■ Appellant's point of error number 1 attacks the trial court's submission of question numbers 3 and 4(D) inquiring as to whether the State was negligent in failing to warn the plaintiffs because the duty is not owed to a particular individual, but to the travelling public generally who may encounter a dangerous condition of which they have no knowledge. In other words, appellant contends that the terminology of the issue was in error to which appellees respond that appellant waived this point of error by failure to specifically include the proper terminology in appellant's objection. We agree with appellees. The only objection to 4(D) was to the term "adequately warn". "Any complaint as to a question, definition or instruction on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objection." TEX.R.CIV.P. 274. The failure to object waives any argument that question 4(D) was defective. The appellant did tender a substitute question 4(D), but did not address the point appellant raised by point of error number 1. Nevertheless, where an objection is required, error cannot be preserved by tendering a request. *Nelson Cash Register, Inc. v. Data Terminal Systems, Inc.*, 671 S.W.2d 594, 599 (Tex.App.—San Antonio 1984, no writ) (request for damage issue did not preserve error that issue submitted wrong damage measure).

■ To question 3, the appellant made the following objection: "Furthermore, the State would object to Plaintiff being specific, that is, we were specific to warn the Plaintiffs and not the general and travelling public on the roadway surface." This objection does not meet the specificity requirement necessary to give the trial court an opportunity to correct any error or deficiency. This purported objection is vague and general and does not call to the trial court's attention the exact matter complained of. *Greenstein, Logan & Co. v. Burgess Marketing, Inc.*, 744 S.W.2d 170, 184 (Tex.App.—Waco 1987, writ denied); TEX.R.CIV.P. 274 (a party's objection to the charge must "point out distinctly the matter to which he objects and the grounds of his objection"). Appellant's point of error number 1 is therefore overruled.

■ In appellant's points of error numbers 2 and 3, appellant argues that the evidence is legally insufficient to support the jury's finding of proximate cause in questions 3 and 4(D). In order to preserve this point of error, the appellant was required to raise it by a motion for instructed verdict, a "no evidence" objection to the submission of questions 3 and 4(D), a motion based on TEX.R.CIV.P. 301 to disregard the issue, or a Rule 301 motion for judgment not withstanding the verdict. O'Connor, *Appealing Jury Findings*, 12 HOUS.L.REV. 65, 71 (1974). The appellant did not, in any of the described motions or by objection, assert there was no evidence that its failure to warn was a proximate cause of the incident. As such, point of errors numbers 2 and 3, are not preserved for appellate review. Therefore, appellant's points of error 2 and 3 are overruled.

■ In appellant's point of error number 4, appellant alleges error in the court's failure to specify what constituted the dangerous condition inquired about in question 4A. Appellant objected to the broad submission of "Dangerous Condition" but did not tender a request for a definition in substantially correct form. As such, appellant has waived any point of error. TEX.R.CIV.P. 279.

Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction

has been requested in writing and tendered by the party complaining of the judgment.

TEX.R.CIV.P. 278; *Woods v. Crane Carrier Co., Inc.,* 693 S.W.2d 377 (Tex.1985). The State having failed to comply with Rule 278 and 279, has waived any complaint that an additional definition specifying the nature of the dangerous condition should have been made. We note that the State did tender two definitions of dangerous condition, but neither of these tendered definitions included language specifying the nature of the dangerous condition.

■ The trial court correctly defined the term "dangerous condition" for the jury. In connection with Questions 4A through 4D, the court submitted the following definition of dangerous condition:

> The term "dangerous condition" used in Questions 4A–4D means a condition that creates an unreasonable risk of harm to the user of the roadway.

This definition was taken exactly from the Texarkana Court of Appeals decision of *State Dept. of Highways and Public Transportation v. Bacon,* 754 S.W.2d 279 (Tex.App.—Texarkana 1988, writ denied). In *Bacon,* the State challenged this definition of dangerous condition. The appellate court rejected the State's arguments and found that the trial court's definition was proper. *State Dept. of Highways and Public Transportation v. Bacon, supra.*

The State's argument that the jury was somehow confused by the definition of dangerous condition is misguided. First, at trial, there was never any doubt as to what constituted the dangerous condition. The "dangerous condition" was identified by the Kings' first witness, Dr. Olin K. Dart, who testified as an expert in traffic engineering. He testified at length that the "dangerous condition" was the hidden and unmarked C-shaped roadway. Apparently, the State's trial counsel was not confused by what constituted the "dangerous condition". He never objected at trial with the association of the condition itself (the obscured roadway) and the hazard caused by that dangerous condition (the potential for one-way traffic to meet two-way traffic in a head-on collision). In fact, the State's trial counsel spent considerable time trying to refute the existence of the dangerous condition through Young, Potter and Blaschke.

Also, the State's trial counsel submitted several definitions of dangerous condition to the trial court for use in lieu of the definition included in the charge. These definitions, tendered by the State, did not include a further definition of what constituted the dangerous condition. One would believe that if the State truly felt the jury was confused by the association of dangerous condition and the hazard associated with it, then an objection at trial would be lodged or, at the very least, it would be specified in the definition submitted by the State.

■ The trial court is given broad discretion in determining the sufficiency of instructions and definitions. The focus is whether the trial court's action was arbitrary or unreasonable. *K–Mart Corp. Store No. 7441 v. Trotti,* 677 S.W.2d 632 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd. n.r.e.). Clearly, no abuse of discretion is indicated, especially since the term defined has previously been approved, in an identical case, by another appellate court; the "dangerous condition" was clearly defined and discussed by all witnesses; and, the State's trial attorney was not confused enough to object or submit an instruction clarifying any confusion.

In summary, the State has waived this point of error by failing to comply with TEX.R.CIV.P. 279 and, moreover, has failed to demonstrate reversible error in the definition given by the trial court. We overrule point of error number 4.

■ Appellant's points of error numbers 5 and 6 complain that the trial court erred in refusing to define "dangerous condition" as one, other than a hazard normally connected with the use of the roadway, which is so dangerous that a person using ordinary care could not encounter such condition in safety and, that the term "dangerous condition" does not include a condition which the user of the roadway, exercising

ordinary care, is likely to himself discover. Thus, in failing to so charge the jury, and in refusing the State's tender of such changes, the trial court error resulted in holding the State to a higher standard of care than that required by law.

We state again that appellant's same arguments were made by the State Department of Highways and Public Transportation before the Texarkana Court of Appeals in *Bacon.* The court held that the definition identical to the one submitted by the trial court in the instant case was correct. The Texarkana Court of Appeals rejected the State's tendered instruction because, "The State's requested language was an effort to inject constructive knowledge as a defense into the definition of a correctly-defined term." *Bacon, supra,* at 282.

 By including the "ordinary care" language into the definition of dangerous condition, the appellant is attempting to condition its duty on the conduct of the plaintiff. In other words, by these definitions, the State takes the position it owes no duty to warn or make safe dangerous conditions which a person of ordinary prudence would discover. This is not the law and was the exact point addressed by the Supreme Court in *Parker v. Highland Park,* 565 S.W.2d 512 (Tex.1978), which abolished the old "no duty" concept. Although a plaintiff's conduct may reduce the State's monetary liability under comparative negligence, it does not affect the duty the State owes to the claimant under the Texas Tort Claims Act. Even should the appellant's premise be accepted and the definition were proper, any failure to include the ordinary care language in the definition of dangerous condition was harmless error. The appellant admitted that Cecil King was not negligent. The court did not tender or submit any issues asking whether King was negligent or whether his family was negligent. Therefore, any language defining dangerous condition in terms of King's failure to use ordinary care is superfluous, especially since the State admits that King was not

negligent. Points of error 5 and 6 are overruled.

 Points of error 7 through 11 inclusive will be considered together as appellant presents and argues them together. The points basically complain that the trial court submitted questions 1 and 2B to the jury and thereafter failed to disregard the jury's answers to those questions because of no evidence or the answers were against the great weight and preponderance of the evidence. The State's arguments are grounded upon two theories: first, that the State can be held liable only for acts in which sovereign immunity has first been waived, and second, there was no evidence that the State failed to place a non-discretionary sign at the accident scene. We need only look to the Tort Claims Act itself to answer these issues. Section 101.025(a) states, "Sovereign immunity to suit is *waived and abolished* to the extent of liability created by this chapter." (emphasis ours). Examining the Act further we find this language under Section 101.060(a)(1), "This chapter does not apply to a claim arising from: the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of *discretionary action* of the governmental unit: ..." (emphasis ours). It is obvious to us that Section 101.025 provides for automatic waiver of sovereign immunity when liability is created within the language of the Act, and that the clear meaning of Section 101.060(a)(1) is that the chapter *does* apply to non-discretionary action of a governmental unit. Thus, raising an issue of a non-discretionary act with regard to installing a traffic or road sign under Section 101.060(a)(1) provides for an automatic waiver of sovereign immunity. This answers the first issue. As for the "no evidence/great weight and preponderance" issue, we earlier made reference to the fact that evidence was presented at trial that the State's own manual provided that where turning movements are required or where unconventional turning movements are permitted at specific lanes from an intersection, lane-use control signs *shall* be used. The record also reflects that the State's manual defines the term "shall" as,

"A *mandatory* condition. Where certain requirements in the design or application of the device are described with the 'shall' stipulation, it is mandatory when an installation is made that these requirements be met." (emphasis theirs). If the State's own manual describes an action as "mandatory", it cannot be discretionary. Examining the testimony of the various witnesses as well as the photographic evidence presented to the jury of the layout of the roadway where the accident occurred, we find ample evidence permitting the trial court to submit the questions to the jury, as well as ample evidence to support the jury's answers to the questions. Points of error 7 through 11 inclusive are overruled.

Appellant's point of error 12 states that the trial court erred in refusing to disregard the jury's verdict because King failed to prove up a cause of action for which the State has waived its sovereign immunity and can be held liable.

This point of error appears to be nothing more than a reurging of points of error 7 through 11. Having overruled points 7 through 11, we find point of error number 12 is without merit. It is global in that appellant makes no reference to any specific jury question submitted nor to any ruling of the trial court. Appellant's point of error 12 is overruled.

▮ Appellant's point of error number 13 complains that the trial court erred in failing to instruct the jury to disregard certain statements made by appellees' counsel in the final argument. In examining the record, we note 5 objections made by appellant during appellees' closing argument. Of those 5, one was overruled of which appellant does not complain; one was sustained, but appellant did not request the trial court to instruct the jury to disregard; and 3 were not explicitly ruled upon.

▮ The burden is upon the party complaining to timely object *and* obtain a ruling on his objection. In the present case, the appellant cites only two passages from the argument which were objected to. In both cases, the court neither sustained nor overruled the objection. Rather the court simply responded as to the nature of the argument. Apparently, the State's trial counsel accepted this response and neither requested a ruling on his earlier objection, clarified his objection in greater detail, or objected to the court's comment. Accordingly, no error, if any existed, has been preserved. TEX.R.APP.P. 52(a). *Perez v. Baker Packers, a Division of Baker International Corp.*, 694 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) (an objection must actually be overruled before it preserves error for our review). The appellant, apparently satisfied with the trial court's comment, failed to obtain a ruling on its objection and further (although not requesting a ruling) failed to object to the court's failure to rule or to the court's comment.

▮ As an added ground of waiver, the appellant did not request the court to instruct the jury to disregard the passages complained of. A request for an instruction to disregard is necessary to preserve appellant's review. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840–841 (Tex. 1979) (a party "by failing to object and press for an instruction at the time of the argument, [waives the] complaint"). Point of error 13 is overruled.

Appellant's point of error number 14 reads:

> The trial court erred in submitting the charge to the jury as it did because the charge given to the jury was, as a whole, misleading and confusing.

Appellant's point of error 14 seems to be a general "catch all" point of error with no specific reference to the record or any specific ruling by the trial court. Instead, the appellant seems to be repeating the same arguments made under previous points of error. For example, in section "a" underneath point of error 14, appellant seems to "re-urge" its argument under points of error 5 and 6.

Under section "b", appellant seems to be arguing about the submission of question numbers 1, 2A and 2B which was covered in point of error number 7.

Section "c" under point of error 14, seems to re-urge point of error number 4.

Finally, the appellant throws in a "cumulative effect" argument in paragraph d.

Having overruled appellant's points of error numbers 4 through 7, we find point of error number 14 is without merit for the reasons stated above with regard to points 4 through 7. Point of error 14 is overruled.

Based upon the foregoing reasons and analyses, the judgment of the trial court is hereby affirmed.

AFFIRMED.